Five Star Dresses, Inc. et al. [1] v. Commissioner. Five Star Dresses, Inc. v. Commissioner
Docket Nos. 54120-54124.
United States Tax Court
T.C. Memo 1958-40; 1958 Tax Ct. Memo LEXIS 190; 17 T.C.M. (CCH) 190; T.C.M. (RIA) 58040; March 14, 1958
*190 1. Cash disbursements were made to various suppliers for merchandise purchased by the individual petitioners Herman Needelman, d/b/a Al-Mel Frocks, and Annette Needelman, d/b/a Five Star Dresses, during calendar year 1945, and by the corporate petitioner Five Star Dresses, Inc., during fiscal years 1946 and 1947, for which petitioners received no written evidence of payment. Part of the cash disbursements was for "all cash" purchases in which petitioners received no invoice or receipt upon delivery and payment, and part thereof represented "service charges" or an additional cash payment, exacted from them on regular billed purchases. All of the cash disbursements were recorded on the separate books and records of the petitioners as part of their cost of goods sold for the years in question except that the service charges recorded on Annette's books included service charges paid by Herman out of funds coming from Annette's business, which service charges were not recorded on Herman's books. Respondent disallowed a portion of said cash disbursements for lack of substantiation. Held, that petitioners are entitled to include in their respective cost of goods sold amounts of claimed cash *191 disbursements disallowed by respondent, except for certain adjustments made herein with respect to the individual petitioners. 2. During the years involved herein, Herman, on behalf of the three petitioners, traveled in order to sell their merchandise. Herman (sometimes accompanied by Annette) also entertained customers. For the fiscal years 1946 and 1947, the corporate petitioner claimed deductions for travel and entertainment in the amounts of $15,658 and $7,140.53, respectively, of which respondent disallowed $6,100 and $2,750 for lack of substantiation. For the calendar year 1945, Herman and Annette deducted travel and entertainment expenses in the respective amounts of $7,602 and $4,608, of which respondent disallowed $3,650 and $1,750 for the same reason. Held, that petitioners failed to meet the burden of proof of error in respondent's determinations disallowing travel and entertainment expenses in the amounts above referred to. 3. During the fiscal years 1946 through 1948, Herman and Annette received large sums of money from Five Star Dresses, Inc., designated on the books and records of the corporation as loans receivable, and as of the close of fiscal year 1948, the balances *192 of their accounts were in the respective amounts of $40,666.52 and $21,297.24. Respondent contends that Herman and Annette are individually liable as transferees of the assets of Five Star Dresses, Inc., for income and excess profits taxes of that corporation for the fiscal year 1946 to the extent of $40,850.67 and $21,297.24, respectively. Held, that the transferor-corporation is not liable for any deficiency in income or excess profits taxes for fiscal year 1946, and hence there is no liability of the individual petitioners as transferees for that year. Morris W. Primoff, Esq., 41 East 42nd Street, New York, N. Y., for the petitioners. Emil Sebetic, Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: This consolidated proceeding involves deficiencies in income and excess profits taxes determined against petitioners as follows: Excess
Taxable
Income Tax
Profits Tax
Docket No.
Petitioner
Year Ended
Deficiency
Deficiency
54120
Five Star Dresses Inc.
Sept. 30,
$32,277.99
$24,322.34
1946
54120
Five Star Dresses Inc.
Sept. 30,
None [2]
None [2]
1947
54121
Herman Needelman,
Sept. 30,
32,277.99
24,322.34
Transferee
1946
54122
Annette Needelman,
Sept. 30,
32,277.99
24,322.34
Transferee
1946
54123
Herman Needelman
Dec. 31, 1945
12,012.35
54124
Annette Needelman
Dec. 31, 1945
25,187.36
*193 At the trial, respondent conceded that with respect to petitioner Five Star Dresses, Inc., the proper amount of disallowed claimed cash disbursements for the taxable year ended September 30, 1946, was $103,354.84, rather than $103,404.84 as set forth in the statutory notice of deficiency. Respondent also conceded on brief that in the cases of Herman Needelman, Transferee, Docket No. 54121, and Annette Needelman, Transferee, Docket No. 54122, their respective liability as transferees was less than the amount set forth in the statutory notices of deficiency in those cases. The principal issues presented for our decision herein are: (1) Whether petitioner Five Star Dresses, Inc., made cash disbursements representing "all cash" purchases of merchandise, includible in its cost of goods sold, during the taxable year ended September 30, 1946, in the amount of $18,128.58. (2) Whether petitioner Five *194 Star Dresses, Inc., made cash disbursements representing additional payments or service charges, includible in its cost of goods sold, during the taxable years ended September 30, 1946 and 1947, in the respective amounts of $85,226.26 and $7,799. (3) Whether petitioner Herman Needelman, d/b/a Al-Mel Frocks, made cash disbursements representing "all cash" purchases of merchandise, includible as part of his cost of goods sold, during the calendar year 1945, in the amount of $10,581.50. (4) Whether petitioner Annette Needelman, d/b/a Five Star Dresses, during the calendar year 1945 made cash disbursements representing "all cash" purchases of merchandise and additional payments or service charges therefor, includible as part of her cost of goods sold, in the amount of $12,981.36 and $15,993.89, respectively. (5) Whether Herman is entitled to include in his cost of goods sold for the taxable year 1945, the amount of $13,019.44 as service charges not deducted on his return. (6) Whether the three petitioners herein are entitled to deductions for travel and entertainment expenses as ordinary and necessary expenses of their respective businesses in excess of the amounts allowed them *195 by respondent for the taxable years involved herein. (7) Whether Herman and Annette are individually liable as transferees of the assets of Five Star Dresses, Inc., for income taxes in the amount of $40,850.67 and excess profits taxes in the amount of $21,297.24 of said corporation for the fiscal year ended September 30, 1946. Findings of Fact Some of the facts are stipulated and, as stipulated, are incorporated herein by this reference. Five Star Dresses, Inc., hereinafter sometimes called the corporate petitioner, is a corporation organized and existing under the laws of the State of New York with its principal office in care of Herman Needelman, 1504 Sheridan Avenue, Bronx 57, New York. Federal income tax returns for the fiscal years ended September 30, 1946, and 1947 were filed with the then collector of internal revenue for the third district of New York. Herman and Annette Needelman, hereinafter sometimes called individual petitioners, are husband and wife, residing at 1504 Sheridan Avenue, Bronx, New York, and filed their individual returns on a calendar year basis for the taxable year 1945 with the then collector of internal revenue for the fourteenth district of *196 New York. Five Star Dresses, Inc., was organized on October 16, 1945, to operate as a jobber of dresses. Its authorized capital stock was 200 shares of no par value, of which 100 shares were issued. Fifty shares each were issued to Herman and Annette for a total consideration of $20,000. The corporate petitioner carried on active dress jobbing activities from October 16, 1945, to about June of 1947, when its active dress jobbing activities decreased considerably. Five Star Dresses, Inc., although inactive, is still in existence and has never been dissolved. Herman and Annette were, and still are, the president and secretary-treasurer, respectively, of the corporate petitioner. The individual petitioners also operated separate enterprises as dress jobbers during the calendar year 1945. Herman (who is now about 63 years of age) conducted a business known as Al-Mel Frocks, a sole proprietorship. Annette conducted a business known as Five Star Dresses, [3] likewise a sole proprietorship. Business activities of the individual and corporate petitioners were conducted from offices and facilities located at 242 West 36th Street, New York City. *197 During the fiscal year 1946, the corporate petitioner reported on its income tax return a net income of $192,049.28 on net sales of $1,283,694.46, and during fiscal year 1947, reported on its return a net loss of $61,490.79 [4] on net sales of $182,803.87. During the fiscal years 1946 and 1947, the corporate petitioner recorded merchandise purchases on its profit and loss statement in the respective amounts of $1,002,659.91 and $176,220.16. During the calendar year 1945, Herman and Annette reported on their separate income tax returns net profit in the respective amounts of $72,372.48 and $53,558.80 on net sales of $419,107.23 and $367,441.81, respectively. During calendar year 1945, Herman and Annette recorded merchandise purchases on their profit and loss statements in the respective amounts of $302,793.77 and $287,561. The books of the corporate and individual petitioners were kept on an accrual basis. Cash purchases and additional cash payments or so-called "service *198 charges," to be discussed infra, were recorded on the petitioners' books in due course and promptly after the checks for the amount of cash payable had been drawn by the bookkeeper. Herman made substantially all of the purchases of dresses from manufacturers and sales to retailers for the three petitioners herein. Because of the scarcity of materials during the years in question, Herman found it difficult to obtain garments from most suppliers unless he either paid for the purchases entirely in cash, or (if paid by check) paid the supplier a "service charge" in cash in excess of the billed price. Where Herman was obliged to make payment to his suppliers entirely in cash or pay a cash service charge, he was unable to get any receipt or evidence of payment of cash from the suppliers for the records of the petitioners. In order to maintain a complete record of such cash transactions, reflecting the full cost of goods, and for the "protection" of the three petitioners (i.e., to substantiate the cash disbursements to the suppliers of merchandise for tax purposes), Herman followed a systematic procedure when purchasing dresses for cash. Under his instructions, when dresses were shipped *199 to petitioners' place of business, they were checked in by employees (Anne Schwartz, William Williams, Sidney Ifshin and Robert Williams) who worked under the immediate supervision of the head bookkeeper, Ruth Davis (now Rakoff). After the dresses were counted, Davis or the employees receiving the merchandise prepared receiving tickets and the head bookkeeper then calculated the amount payable. Davis personally prepared the bills on shipments that arrived without any invoice. She then prepared a check payable to "cash" for the amount of the bill. The checks were taken to the bank to be cashed most of the time by Davis, Schwartz or Ifshin. On occasion, Herman also cashed checks at the bank. After the checks were cashed, the money was brought to petitioners' place of business and turned over to Herman. Each of the petitioners herein maintained a complete set of double entry books including a general ledger, general journal, purchase book, cash receipts book, cash disbursements book, accounts receivable and accounts payable ledgers. Checks drawn to the order of cash in payment of "all cash" purchases of the three petitioners had recorded on the stubs thereof by the head bookkeeper the *200 names of the suppliers. Davis recorded such checks and names in the respective petitioners' cash disbursement books and posted the cash payment to the suppliers' accounts in the accounts payable ledgers and to the accounts payable controlling accounts. In addition to "all cash" purchases made by petitioners during the years in question, because of the scarcity of merchandise, Herman was unable to buy dresses from certain suppliers without payment of an additional cash payment or so-called "service charge" in connection with the regular purchase. Herman was aware of the maximum price controls imposed by the Office of Price Administration on purchases and sales during the period involved. During the years involved herein, the price petitioners paid for dresses ranged between $4.75 to $19.75, depending on the manufacturer and quality of the garment. In addition to the regular billed price, the service charges ranged from 50 cents to $3 per dress, depending largely on the purchase price of the particular garment. Where service charges were involved (unlike "all cash" purchase transactions, supra) petitioners obtained a bill with each delivery from the supplier for the regular price *201 of the merchandise. After the garments were checked by the employees, the head bookkeeper calculated the amount of the service charge by multiplying the number of dresses by the amount of the additional payment per dress, which she obtained from Herman, or which she already knew from prior purchases of the same style of garments. Herman had informed his bookkeeper what the service charges represented. After the amount of the additional payment was computed, Davis made out a check, payable to "cash," drawn on the account of the particular petitioner making the purchase. Sometimes she included the service charges payable to several suppliers on a single check. As in the case of the checks used for "all cash" payments, also payable to "cash," it was the office practice to send one of the aforementioned employees of petitioners to the bank to cash the checks and to turn the proceeds over to Herman, although, on rare occasions, Herman went to the bank himself to cash them. When the employees took the checks to the bank, it was necessary for them to endorse said checks. Davis usually endorsed the checks before getting the cash, but sometimes a bank employee would approve the check for cash *202 payment without her endorsement. Sometimes Herman went to the suppliers' places of business to give them the cash, either for the "all cash" purchases (without invoices) or for the service charges. Usually, however, the suppliers came up to petitioners' place of business to obtain the cash payment in which event Herman usually paid them the money in the receiving stockroom, located in the rear of the premises. Sometimes he gave them the money in front of the office leading to the showroom. On occasion, when the suppliers were in a hurry, Herman paid them the cash in the presence of the bookkeeper and other employees. Sometimes the suppliers waited at the petitioners' place of business while the dresses were counted and received the cash payment at that time. Several of petitioners' employees (who had cashed checks and handed the money in an envelope to Herman) saw the money turned over to the suppliers or their representatives, in some instances as soon as the employees gave Herman the cash. Pursuant to Herman's instructions, the bookkeeper wrote the words "service charge" on the checks payable to cash which were to be used for additional payments to suppliers, and also wrote these *203 words in the cash disbursement book. Davis recorded the regular price of the merchandise on petitioners' books, and a separate record of the amounts and recipients of service charges was likewise made. Recipients of the cash payments were not aware that their names or that of their company had been placed on the check stubs or in the cash book. Annette was aware of her husband's practice of paying cash to suppliers in "all cash" transactions without invoices and also of the payment of service charges on regular billed goods for certain shipments. Annette discussed the matter of such payments with Herman and endorsed some of the aforementioned checks to the order of cash. When she was at petitioners' place of business, she saw her husband pass cash to certain suppliers. Herman had stored most of petitioners books and records in the Sophia Brothers Warehouse, 61st Street and Columbia Avenue, New York City, during the years involved herein, and some of these records were either misplaced or lost. Consequently, at the time of the instant trial, petitioners did not have in their possession invoices of all the suppliers to whom service charges were allegedly paid. Twenty of the 26 service *204 charge checks which the corporate petitioner did not have in his possession, and four service charge checks which individual petitioner Annette did not have in her possession at the time of trial, were properly accounted for since the numbers and details of said checks appear on receipts given by United States Government investigators when the investigators took said checks from petitioners' place of business. Petitioners, however, had in their possession numerous invoices for "all cash" purchase items showing the names of suppliers (viz. Holsberg and Lasoff, Dandy Dresses, Gloria Jane, Landmark Dress Co.), with receiving tickets attached, which had been prepared by petitioners' employees. Also, petitioners had retained numerous checks which were cashed by petitioners' employees, the proceeds thereof having been used for the payment of said invoices. During the fiscal year 1946, the corporate petitioner purchased merchandise from nineteen suppliers in the aggregate amount of $782,943.33. During the taxable years in question, in addition to the amounts the corporate petitioner paid by check to suppliers, cash disbursements for purchases were recorded on its books, and disallowed *205 by respondent, in the following amounts: Disallowed by
Name of Supplier
Fiscal 1946
Respondent [1]
Kaaren Jr., Inc.
$ 34,614.86
$ 34,614.86
Leicht & Soltzer
58,954.00
Miss Prep Jr. Dress Co.
17,993.50
17,993.50
Holsberg & Lasoff
12,598.00
Landmark Dress Co.
28,480.50
19,866.00
Bentley Dress Co.
20,317.50 [2]
Dandy Jr.
19,365.58
19,365.58 [3]
Wm. P. Fier
5,051.00 [4]
Comely Frocks
3,336.00
3,336.00
Warwick's Womens
999.50
999.50
Progress Frocks, Inc.
586.00
586.00
Miss Miniver
248.50
248.50
Larry Hirsch
50.00
50.00
Lovely Frocks
1,886.50 [5]
1,876.50
Frances Dress Corp.
1,636.00
1,636.00
Winnie
800.00
800.00
Gloria Jane
1,725.00
1,725.00 [6]
Adrian
257.40
257.40
$208,899.84 [7]
$103,354.84 [8]
Disallowed by
Name of Supplier
Fiscal 1947
Respondent [9]
Kaaren Jr., Inc.
$ 2,270.00
$2,270.00
Leicht & Soltzer
7,531.00
Miss Prep Jr. Dress Co.
2,642.00
2,642.00
Holsberg & Lasoff
Landmark Dress Co.
3,678.00
2,602.00
Bentley Dress Co.
9,974.00
Dandy Jr.
Wm. P. Fier
2,126.07
Comely Frocks
Warwick's Womens
Progress Frocks, Inc.
Miss Miniver
Larry Hirsch
Lovely Frocks
285.00
Frances Dress Corp.
Winnie
Gloria Jane
Adrian
$28,506.07 [10]
$7,799.00 [ 7,515.00]
*206 *207 There is included in the aforesaid cash disbursements for purchases in the aggregate amount of $208,899.34 during the fiscal year 1946, the sum of $30,726.56, representing cash disbursements for "all cash" purchases, and the amount of $178,172.76 shown on the books of the corporate petitioner as "service charges." Of the latter amount, the respondent conceded that the sum of $910 was actually spent for merchandise. Respondent disallowed claimed service charges allegedly paid to 13 suppliers in the aggregate amount of $85,226.26. For the fiscal year 1947, the books of the corporate petitioner show cash disbursements for purchases in the aggregate amount of $32,188.07, representing in its entirety cash disbursements for service charges. Of this amount, the respondent allowed the sum of $3,682 paid to Landmark Dress Co. It is stipulated that the balance in the sum of $28,506.07 represents claimed service charges. Of said amount, the respondent disallowed the aggregate amount of $7,799, representing claimed service charge payments to four suppliers. The service charge items of $32,188.07 are represented by 45 checks drawn to the order of cash, all of which show thereon the words "service *208 charges" and the names of the suppliers to whom the corporate petitioner claims the cash was paid during the fiscal year in question. The names of the suppliers were likewise recorded on the check stubs and in some instances in the cash disbursement book of the corporate petitioner. The profit and loss statement of Herman, d/b/a Al-Mel Frocks, for the taxable year 1945 shows merchandise purchases in the amount of $302,793.77. During the calendar year 1945, Herman, d/b/a Al-Mel Frocks, recorded cash disbursements on his books for merchandise in the aggregate amount of $82,828.60, of which respondent disallowed $10,581.50, consisting of the following: Claimed
Amount
Cash
Disallowed
Name of Supplier
Purchases
by Respondent
Landmark Dress Co.
$17,322.00
$ 5,475.50
Holsberg and Lasoff
11,124.25
Dandy Dress Co.
49,276.35
Fairest
2,750.00
2,750.00
Henry Dress
1,275.00
1,275.00
Cherlane
506.00
506.00
Gloria Jane
575.00
575.00
Total
$82,828.60
$10,581.50
The books and records of Herman do not show any service charges paid to suppliers as in the case of the other two petitioners. The profit and loss statement of Annette, d/b/a Five Star *209 Dresses, for taxable year 1945 shows merchandise purchases in the amount of $287,561. During the calendar year 1945, Annette, d/b/a Five Star Dresses, recorded on her books cash disbursements to 24 suppliers for merchandise purchased in the aggregate amount of $42,565.29, consisting of cash disbursements for "all cash" purchases in the amount of $15,045.86 and cash payments for service charges in the amount of $27,519.43. Of the latter amount, respondent allowed the sum of $11,525.54 and disallowed service charges in the amount of $15,993.89, consisting of the following: Kaaren Jr., Inc.
$ 4,158.00
Miss Prep, Jr.
2,266.50
Leicht & Soltzer
2,211.00
Landmark Dress Co.
1,882.48
Pommette Dress
87.50
Frances Dress
1,621.85
Progress Frocks
194.00
Warwick Dress
697.00
Comely Dress
1,024.00
Lovely Frocks
500.00
Winnie Frocks
190.06
Vee Dress
400.00
Adrian Dress
336.00
Larry Hirsch
125.00
Holland Dress
100.00
Miss Miniver
150.50
Borsky
50.00
Total
$15,993.89
The service charge items of $27,519.43 are represented by 42 checks drawn to the order of cash, all of which checks show thereon the words "service charges" and the names of the suppliers *210 to whom the cash was paid during the year 1945. The names of the suppliers were likewise recorded on the check stubs and in some instances in the cash disbursement book of petitioner Annette Needelman. Of the said service charge items totalling $27,519.43 recorded on the books of Annette, the sum of $13,019.44 [5] represented service charges paid by Herman, d/b/a/ Al-Mel Frocks, as service charges on purchases for his own business, the money coming from Annette, d/b/a Five Star Dresses. Annette had no objection to the use of the money by Herman for his own service charges. The amount of $13,019.44 was erroneously charged as purchases by Annette and erroneously deducted by her. The amount in question was not charged on Herman's books and was not deducted by him on his income tax return. The corporate petitioner recorded on its profit and loss statements *211 and on its Federal income tax returns for the fiscal years 1946 and 1947 the respective amounts of $15,658 and $7,140.53 as traveling and entertainment expenses, of which respondent in his statutory notice disallowed the amounts of $6,100 and $2,750, respectively. Net sales of the corporate petitioner recorded on its profit and loss statement for the fiscal years 1946 and 1947 are in the respective amounts of $1,283,694.46 and $182,803.87. Likewise, the individual petitioners Herman and Annette recorded on their profit and loss statements and income tax returns for the taxable year 1945 the respective amounts of $7,602 and $4,678 as traveling and entertainment expenses, of which respondent disallowed the amounts of $3,650 and $1,750, respectively. Net sales of Herman and Annette recorded on their profit and loss statements for the year 1945 are in the respective amounts of $419,107.23 and $367,441.81. During the years in question, Herman, on behalf of the three petitioners herein, traveled to the Middlewest, and to Chicago, Philadelphia, Washington, Baltimore and other cities to visit customers and to sell dresses. Although dresses were scarce, and many retailers came up to petitioners' *212 place of business in New York, Herman was still obliged to travel about the city to sell some of the merchandise, and to contact certain out-of-town accounts. Petitioners, moreover, were looking to the future when dresses would not be scarce and Herman was desirous of visiting their present and potential customers. The comparative balance sheets of Five Star Dresses, Inc., as of the close of the fiscal years 1946 to 1956, inclusive, are as follows.. FIVE STAR DRESSES, INC., COMPARATIVE BALANCE SHEETS AS AT THE
CLOSE OF
THE FISCAL YEAR ENDED SEPT. 30, 1946 TO SEPT. 30, 1956, INCLUSIVE
[1]
9/30/46
9/30/47
9/30/48
9/30/49
Assets
Cash
$ 84,765.14
$ 37,386.71
$ 1,178.35
$ 147.26
Accounts Receivable
160,443.10
47,262.08
459.75
282.75
Inventories
7,222.00
3,087.50
1,575.40
Capital Assets
1,908.92
2,247.77
Loans Receivable: Herman Needelman
16,324.57
27,971.51
40,666.52
40,716.52
Annette Needelman
6,863.04
20,401.38
21,297.24
21,297.24
Miscellaneous
15.00
Deposits
175.00
100.00
Due from Annette Fashions,
Inc.
25,631.37
25,631.37
Due from Terry Taylor, Inc.
1,550.00
Total Assets
$277,516.77
$138,546.95
$90,908.63
$89,625.14
Liabilities and Capital
Accounts Payable
$ 55,315.72
$ 4,535.86
Accrued Expenses
9,370.53
6,768.94
$ 1,412.11
$ 1,352.94
Other Liabilities
781.24
153.29
Reserve for Fed. Inc. Tax
93,878.50
35,977.45
Capital Stock
20,000.00
20,000.00
20,000.00
20,000.00
Surplus: Earned Surplus
98,170.78
71,111.41
69,496.52
68,272.20
Total Liabilities
$277,516.77
$138,546.95
$90,908.63
$89,625.14
*213 FIVE STAR DRESSES, INC., COMPARATIVE BALANCE SHEETS AS AT THE
CLOSE OF
THE FISCAL YEAR ENDED SEPT. 30, 1946 TO SEPT. 30, 1956, INCLUSIVE
[1]
9/30/50
9/30/51
9/30/52
9/30/53
Assets
Cash
$ 27.30
$ 27.30
$ 27.30
$ 27.30
Accounts Receivable
309.75
309.75
309.75
309.75
Inventories
Capital Assets
Loans Receivable: Herman Needelman
40,716.52
40,850.67
40,850.67
40,850.67
Annette Needelman
21,297.24
21,297.24
21,297.24
21,297.24
Miscellaneous
Deposits
Due from Annette Fashions,
Inc.
25,496.19
25,496.19
25,496.19
25,496.19
Due from Terry Taylor, Inc.
1,549.52
1,549.52
1,488.64
1,427.82
Total Assets
$89,591.52
$89,530.67
$89,469.79
$89,408.97
Liabilities and Capital
Accounts Payable
Accrued Expenses
$ 1,352.28
$ 1,324.90
$ 1,324.84
$ 1,324.78
Other Liabilities
Reserve for Fed. Inc. Tax
Capital Stock
20,000.00
20,000.00
20,000.00
20,000.00
Surplus: Earned Surplus
68,239.24
68,205.77
68,144.95
68,084.19
Total Liabilities
$89,591.52
$89,530.67
$89,469.79
$89,408.97
FIVE STAR DRESSES, INC., COMPARATIVE BALANCE SHEETS AS AT THE
CLOSE OF
THE FISCAL YEAR ENDED SEPT. 30, 1946 TO SEPT. 30, 1956, INCLUSIVE
[1]
9/30/54
9/30/55
9/30/56
Assets
Cash
$ 27.30
$ 27.30
$ 27.30
Accounts Receivable
309.75
309.75
309.75
Inventories
Capital Assets
Loans Receivable: Herman Needelman
40,850.67
40,789.97
40,729.33
Annette Needelman
21,297.24
21,297.24
21,297.24
Miscellaneous
Deposits
Due from Annette Fashions,
Inc.
25,496.19
25,496.19
25,496.19
Due from Terry Taylor, Inc.
1,367.06
1,367.06
1,367.06
Total Assets
$89,348.21
$89,287.51
$89,266.87
Liabilities and Capital
Accounts Payable
Accrued Expenses
$ 1,324.72
$ 1,324.66
$ 1,324.69
Other Liabilities
Reserve for Fed. Inc. Tax
Capital Stock
20,000.00
20,000.00
20,000.00
Surplus: Earned Surplus
68,023.49
67,962.85
67,902.18
Total Liabilities
$89,348.21
$89,287.51
$89,226.87
*214 During the fiscal years 1946 to 1956, inclusive, the books and records of the corporate petitioner show that the individual petitioners received certain amounts as "loans receivable," the following schedule representing the balances thereof at the end of each fiscal year: Herman
Annette
Date
Balance
Balance
1946
$16,324.57
$ 6,863.04
1947
27,971.51
20,401.38
1948
40,666.52
21,297.24
1949
40,716.52
21,297.24
1950
same
same
1951 to 1954
40,850.67
21,297.24
1955
40,789.97
21,297.24
1956
40,729.37
21,297.24
Annette Fashions, Inc., is a corporation organized on January 16, 1947, and existing under the laws of the State of New York, of which all the stock is owned by the individual petitioners. The comparative balance sheets of the corporate petitioner for fiscal years 1948 and 1949 show that the amount of $25,631.37 is due from Annette Fashions, Inc., representing "loans." At the time of the instant trial, the corporate petitioner had not collected the aforesaid balances of the amounts due and owing to it from the individual petitioners and from Annette Fashions, Inc. Ultimate Findings of *215 Fact During the fiscal year 1946, Five Star Dresses, Inc., paid out in cash to suppliers for "all cash" purchases the amount of $18,128.58 which constitutes a part of its cost of goods sold. During the fiscal years 1946 and 1947, Five Star Dresses, Inc., disbursed to suppliers additional cash payments in the respective amounts of $85,226.26 and $7,799, recorded as and included in service charges on the books of the corporate petitioner, and said amounts constitute a part of its cost of goods sold. During the calendar year 1945, Herman, d/b/a Al-Mel Frocks, paid out in cash for "all cash" purchases the amount of $10,581.50, which constitutes a part of his cost of goods sold. During the calendar year 1945, Annette, d/b/a Five Star Dresses, paid out in cash to suppliers for "all cash" purchases the amount of $12,981.36 which constitutes a part of her cost of goods sold. During the calendar year 1945, Annette, d/b/a Five Star Dresses, recorded on her books service charges in the amount of $27,519.43. Of this latter amount, Herman, d/b/a Al-Mel Frocks, paid the sum of $13,019.44 out of funds coming from Annette, d/b/a Five Star Dresses, which was a part of his cost of goods sold *216 for the taxable year 1945. The balance of $14,499.99 was paid out by Annette, d/b/a Five Star Dresses, and constitutes a part of the cost of goods sold by her. Opinion Issues I, II, III, IV The three petitioners herein contend that they are entitled to include in their cost of goods sold for the years in question cash disbursements to various suppliers of merchandise, representing "all cash" purchases and so-called "service charges" or additional cash payments in the amounts set forth in our Findings of Fact, which sums were disallowed by respondent for lack of substantiation. These issues all involve the common question of fact as to whether the amounts of the alleged payments, which were recorded on the books and records of petitioners herein as having been paid out to designated suppliers of merchandise, were actually so disbursed. Respondent apparently does not question that petitioners' books and records clearly reflect the cash disbursements and the nature thereof, but maintains that the petitioners must establish by competent documentary evidence that each and every item recorded was actually disbursed as part of their cost of goods sold during the years involved herein. *217 Respondent's determination is, of course, prima facie correct and petitioners have the burden of proof of error. We are of the opinion, upon a consideration of the entire record and, for the reasons hereinafter stated, that petitioners have established by a preponderance of the evidence that during the years in question they actually paid the amounts in dispute with respect to "all cash" purchases and service charges, and, with some adjustments to be discussed infra, that such cash payments constituted part of their cost of goods sold. The record is clear that all of the disbursements in dispute and the recipients thereof were entered on petitioners' books and records when the transactions occurred. There was no secrecy involved on the part of petitioners. Ostensibly, Herman Needelman, who made all of the purchases and handled the cash disbursements for the three petitioners, took special precautions in an effort to "protect" the petitioners from the very plight in which they eventually were placed by letting the employees know that he was obliged to make "all cash" payments for certain dresses, without receiving any invoices or written evidence of payment, and that service charges *218 were also being exacted on billed purchases. Pursuant to Herman's explicit instructions, as fully described in our Findings of Fact, the employees participated and cooperated with him in systematically recording the pertinent details of each transaction, including the amounts of cash paid and the recipients thereof. At the outset, while we voice no approval of cooperation with suppliers who were violating existing law relating to ceiling prices set by the Office of Price Administration (under the Emergency Price Control Act of 1942), we think it is clear that petitioners did face a difficult problem, under the circumstances, in their efforts to obtain scarce merchandise and to preserve accurate records reflecting the true cost thereof. Apparently, respondent is cognizant of these difficulties for he concedes, on brief, that short supply and heavy demand, coupled with O.P.A. price controls, created "a situation where excessive prices were demanded and paid on occasion." There is no question here but that the cash service charges for merchandise, if established by petitioners, are includible in the cost of goods sold. , (C.A. 1, *219 1952), affirming a Memorandum Opinion of this Court dated May 8, 1951 [; . Respondent raises no issue in this respect. At the trial, Herman and Annette testified in their own behalf, maintaining that they had disbursed all of the money reflected on the books of the three petitioners as part of their respective costs of goods sold. In support of their position, petitioners had in their possession numerous invoices and checks that had been prepared by their employees at the time the merchandise was delivered. Petitioners also had invoices from suppliers (on the suppliers' own stationery) who gave them a bill for the regular price where payment was accepted by check and only service charges or "side payments" were required to be paid in cash. Each of the invoices prepared by petitioners' own bookkeeper bears an invoice number, folio number, the date paid, the check number and the initials "RD" (Ruth Davis). For each of these invoices, petitioners had in their possession a corresponding check (except for Al-Mel Frocks, to be discussed infra) covering the claimed cash payment in question. Five former employees of *220 petitioners corroborated the testimony of Herman and Annette in all essential respects relating to the technique of preparing the aforesaid records of cash transactions and disbursing the cash to suppliers who visited petitioners' place of business. To refute petitioners' position, respondent called four of the named recipients of the alleged cash payments who denied having received the disbursements in question. In this posture, the case presents an issue of fact, and the outcome must necessarily depend upon our belief or disbelief of their testimony based upon our analysis of the record and our observation and appraisal of the witnesses. In our opinion, it is clear from the record that the testimony of the individual petitioners and that of their former employees can be relied upon with respect to the issue before us. We were favorably impressed with the testimony of Herman and by his demeanor on the witness stand. From the standpoint of credibility, as well as recollection, his testimony was convincing and we take it as reliable in itself except for some of his rationalizations, which we discuss later, since we think his inadequacies in this respect, to the extent we adopt his *221 contentions, are supplied elsewhere in the record. Likewise, we place reliance upon the testimony of Ruth Davis, the head bookkeeper, who gave a forthright account of the contemporaneous entries made by her and by the workers under her supervision of each cash transaction. We were particularly impressed by the testimony of Davis and several other employees who stated that certain suppliers, whom they identified by name, visited petitioners' place of business several times a week and received cash payments from Herman, sometimes in the presence of the employee who had a short time before endorsed the check (of one of the petitioners) payable to cash, in order to obtain cash from the bank. We do not believe these employees, individually or as a group, have perjured themselves, and respondent has not directed our attention to any conflict in their testimony. After a careful consideration of all of the evidence, we are convinced that petitioners' witnesses were on the whole worthy of belief. On the other hand, we had the impression that the testimony of the four suppliers, introduced by respondent to refute petitioners' witnesses and records of the cash payments in question, was unreliable *222 and lacking in candor, and disclosed obvious bias. Abraham E. Friedman, credit manager of Dandy Dress, who the corporate petitioner claims received the aggregate amount of $19,365.58 during fiscal 1946 for "all cash" purchases from Dandy Dress and Dandy Jr. (shown as claimed cash disbursements to Dandy Jr. on the books of Five Star Dresses, Inc.) denied that he ever received any excess charges from Herman during the years 1945 and 1946. In our opinion, his denial, in the light of the testimony of petitioners' employees, is unworthy of belief. We note, also, in this connection the fact that respondent allowed the full amount of $49,276.35, representing cash payments by Herman, d/b/a Al-Mel Frocks, to Dandy Jr. for "all cash" purchases in 1945. Friedman at first stated that it was not possible that he personally received the $49,276.35 but later admitted that it could have happended that a part of that amount was received by him. He stated further that he visited petitioner's place of business only two or three times during the years 1945, 1946 and 1947. This testimony is contradicted by Annette and three of the petitioners' employees who stated that Friedman came once or twice each *223 week. Two of the employees, including the bookkeeper, saw Friedman take money from Herman on such visits. Under the circumstances, we are persuaded to accept petitioners' contention with respect to the claimed cash payments to Dandy Dress and Dandy Jr. In passing, we observe that Friedman stated that he did not recall whether any Government agent, either Federal or State, as a result of a personal examination made after his returns were filed, included any cash payments which he had received from any dress house. He later declined to answer any questions concerning his activities. Likewise, we were not favorably impressed with the testimony of Nathan Leicht, partner in the firm of Miss Prep Jr. Dress Co. Herman testified unequivocally that during fiscal year 1946 cash service charges in the aggregate amount of $17,993.50, disallowed by respondent, were paid by Five Star Dresses, Inc., to Nathan, and that most of the time the cash was paid over in petitioners' place of business. Nathan categorically denied that any sales were made to the corporate petitioner or to Annette, d/b/a Five Star Dresses, in which excess amounts in cash were received, and testified that he never received *224 any cash from petitioners during his infrequent visits to their place of business. Nevertheless, in addition to Herman, Annette and all of the five employees of petitioners testified that they saw Nathan come to petitioners' place of business regularly, and all but one saw him take money. Anne Schwartz, petitioners' assistant bookkeeper, identified Nathan as the recipient of cash which she had obtained for the petitioners' checks which she had endorsed and cashed. On consideration of all of the evidence, we cannot accept Nathan's testimony as correct. Similarly, we have little confidence in the testimony of Herman Kramer, part owner of Landmark Dress Co., who likewise denied having received all of the claimed cash disbursements ascribed to his firm on the books of Five Star Dresses, Inc. The corporate petitioner claimed cash disbursements as service charges paid to Landmark Dress Co. during fiscal year 1946 in the aggregate amount of $28,480.50, of which $19,866 was disallowed by respondent. This item is different from those of other suppliers (i.e. Dandy Jr., Kaaren, Jr., Inc., and Miss Prep Jr. Dress) in that respondent, in this instance, allowed a portion of the claimed cash service *225 charges, and the supplier, Kramer, admitted having received from Five Star Dresses, Inc., and from Herman Needelman the sum of $1 per dress as a service charge in excess of prevailing O.P.A. maximum ceiling prices thereon. Except for this admission with respect to service charges, Kramer denied that he ever had any cash sales or that he ever received any cash from Herman for "all cash" sales to Al-Mel Frocks. We observe that this denial is not consistent with respondent's allowance of the amount of $11,846.50 out of $17,322 claimed by Al-Mel Frocks as "all cash" purchases in 1945. We also note that it was elicited from Kramer, under cross-examination, that the records of his firm did not reflect the aforesaid admitted overages received from petitioners. Moreover, Kramer refused to testify as to whether such overages were included in Landmark's income tax returns. Having evaluated Kramer's testimony in the light of all the evidence, we are persuaded that he received service charges as high as $2 and $3 per dress rather than the $1 admitted at the trial, and that petitioners are entitled to include in their cost of goods sold all claimed cash disbursements to Landmark Dress Co. We *226 also found the testimony of Sam Alter, salesman for Champagne Frocks, Inc., less than candid as well as in direct conflict with the testimony of petitioners' employees. Alter denied having visited the place of business of petitioners during 1945 to obtain money from Herman, but the head bookkeeper and other employees testified that he was a frequent visitor. In view of the foregoing, and upon consideration of the record as a whole, we have no confidence in the testimony of the four witnesses presented by respondent. They appeared, in general, evasive and all too willing to bend the facts to suit what they conceived to be their own best interests. In our appraisal of their credibility, in making our findings, we take into consideration their obvious motives of self protection. While we recognize that the burden of proof must be shouldered by petitioners, it is noteworthy that although respondent made a substantial audit of the books and records of the petitioners for the years involved, he did not adduce any evidence that proceeds of the cashed checks involved herein were diverted into any wrong bank accounts or enriched any of the petitioners. We are aware of the fact that Herman, *227 as suggested by respondent, could have duplicated some of the checks for the cash payments in question, of which a few were withdrawn from petitioners' bank account in the same amounts on the same day. Such a factor, of course, requires careful scrutiny and consideration on our part. Davis, the head bookkeeper, testified to our satisfaction that each cash withdrawal, represented by a check payable to cash, was correlated with an actual receipt of merchandise and that it was not unusual to make identical service charge payments on the same day. We do not believe it is unlikely in normal business operations to receive several shipments in the same quantities and at the same prices from the same supplier in a day. The testimony, documentary evidence, and detailed book entries made at the time the transactions occurred, which underlie our Findings of Fact regarding the cash disbursements in issue, demonstrate to our satisfaction that petitioners expended the disputed cash payments for merchandise. In the light of the foregoing, and the record as a whole, we are convinced that the books and records of petitioners correctly reflect the cash amounts paid for the "all cash" purchases and *228 "service charges" during the years in question and properly constitute part of the cost of goods sold, as recorded on the books, except for the amount of $13,019.44 paid for service charges, which we have attributed in our Findings to Al-Mel Frocks instead of Five Star Dresses, as discussed infra. Having thus resolved this basic factual issue in favor of petitioners, we believe that our ultimate Findings of Fact are dispositive of the several issues herein relating to the claimed cash disbursements and that an extended analysis of the evidence would serve no useful purpose. In passing, we observe that our examination of the stipulation enumerating the checks payable to cash (Exhibit 7-G) which petitioners allegedly used for purchases, indicates that at least in form the said checks were handled in the identical manner as those allowed by respondent (viz. $58,954 paid to Leicht and Soltzer). While respondent's determination is prima facie correct, it is to be noted that there is no evidence in the record explaining the difference in his treatment of said checks. Issue V We now consider the question of whether Herman, d/b/a Al-Mel Frocks, is entitled to include in his cost of *229 goods sold for the taxable year 1945 the amount of $13,019.44, not previously claimed on his return, as service charges, with a corresponding disallowance to Annette. The amount is admittedly an estimated allocation, made at the suggestion of petitioners, but appears reasonable, and respondent has raised no objection to the allocation as such (provided, of course, we hold that the service charges shown on Annette's books were actually paid, and that they represent service charges of which a substantial part are properly attributable to Herman's cost of goods sold). In effect, in accepting the allocation, we are applying the principles of (C.A. 2, 1930). While Herman's testimony on this issue was in some respects confused, and included his rationalizations of the circumstances, we think that from the record as a whole, the picture is delineated with reasonable accuracy. For the reasons already discussed in Issues I, II and III, we have no doubt that the total service charges of $27,519.43 recorded on Annette's books were actually paid, and we have so found as a fact. We likewise think it is clear that although no service charges *230 were recorded on Herman's books, he, in fact, paid substantial service charges for 1945 purchases for his own business, and that there is a reasonable inference from the testimony that his service charges were a part of the $27,519.43 recorded on Annette's books. Herman handled all such cash payments, in most instances, by personally paying the supplier after the checks were cashed, but at times sending the money by messenger. It is true that the funds which Herman used to pay his own service charges originated from Annette, but she had no objection to his using the money for this purpose, and the payments to the suppliers were made by him in respect of his own purchases. Under the circumstances, we hold that the payments made by him for his own business are properly a part of his cost of goods sold, and we see no reason in the instant case to inquire as to whether the amounts so used are to be treated as loans from Annette to Herman, or as gifts, or other permissive use. Clearly the family relationship was such that there is no aura of suspicion surrounding the circumstances. In view of our discussion, supra, we need not elaborate upon the formula by which $13,019.44 out of $27,519.43 *231 was attributed or allocated to Herman as cost of goods sold. We merely add that Annette's cost is to be correspondingly reduced, leaving her service charges at $14,499.99, of which $11,525.54 was allowed by respondent. We add that, while we agree with petitioners that their books were on an accrual basis, we would reach no different result if we had found, as contended by respondent, that such books were on a hybrid or cash basis. Issue VI This issue relates to petitioners' claimed deductions for traveling and entertainment expenses incurred with respect to their jobbing business, which amounts respondent disallowed in part for rack of substantiation. The returns of the Five Star Dresses, Inc., and its books for the fiscal years 1946 and 1947 show deductions for travel and entertainment expenses in the amounts of $15,658 and $7,140.53, respectively. Respondent determined that the corporate petitioner is entitled to deduct the respective amounts of $9,558 and $4,390.53 for said years, and disallowed the balance. Respondent's disallowance of deduction is presumptively correct, and the evidence here *232 fails to rebut that presumption. While expenditures purporting to be for travel and entertainment were recorded on petitioners' books, there is no evidence of the occasions, circumstances, or, with respect to entertainment, the persons entertained, in so far as the disallowed items are concerned. The testimony of Herman and Annette was quite vague and general. No contemporaneous memoranda of the attending circumstances were produced, and there is no evidenc that any such memoranda were ever made or retained. Respondent is entitled to make an audit and require substantiation if he deems it appropriate. The evidence produced does not supply this opportunity and, if accepted, would in effect make the taxpayer the judge of both law and facts on this issue. Counsel for Five Star Dresses, Inc., contends, on brief, that respondent was "arbitrary and inconsistent" in selecting the amounts for disallowance, that the full amounts claimed as deductions were reasonable and necessary in the conduct of its business. The question presented, however, is not whether the claimed expenditures were ordinary and necessary in the trade or business of the corporate petitioner, but rather whether said expenses *233 have been substantiated. Conceding that the percentage of its claimed travel and entertainment expenditures in relation to annual net sales (i.e., 1.2 per cent of net sales), as reflected in our Findings of Fact, is not controlling, the corporate petitioner maintains nevertheless that its expenditures for travel and entertainment were very "conservative" in view of the substantial percentage of net profit reported. While the argument of the corporate petitioner may be true, there is insufficient evidence in this record to support the view that any larger amounts than those already allowed by respondent were in fact expended for such business purposes on behalf of Five Star Dresses, Inc. In view of the meager and unsatisfactory evidence, we hold that respondent's determination was reasonable and that Five Star Dresses, Inc., has failed to sustain the burden of proving error. See (C.A. 5, 1954), affirming a Memorandum Opinion of this Court dated April 21, 1952 [; . Individual petitioners Herman and Annette deducted traveling and entertainment expenses *234 during the year 1945 in the respective amounts of $7,602 and $4,608, of which respondent allowed the sums of $3,952 and $2,858, respectively, and disallowed the balance thereof for lack of substantiation. The discussion above with respect to Five Star Dresses, Inc., applies equally to the disallowances made with respect to the individual petitioners for the year 1945. It is to be noted that of the total amount of travel and entertainment expenses claimed by the three petitioners in the aggregate amount of $35,078, respondent allowed some 59 per cent. In our opinion, the vague and inconclusive evidence introduced by petitioners does not warrant additional allowances or establish error in the determinations. Petitioners, relying on (C.A. 2, 1934), reversing a Memorandum Opinion of this Court, dated February 8, 1933, argue that Herman's testimony was uncontradicted, and must be accepted as proof that such expenditures were made, and were in fact ordinary and necessary expenses of the respective petitioners. We think that , distinguishes itself from the case before us, since the Court *235 said, in part (p. 256): "In the instant [Blackmer] case, the petitioner in his testimony named the persons, places, and events and stated in each instance the benefit he expected to obtain in a business way from entertaining the persons mentioned." No such evidence was produced in the instant case. Issue VII Respondent contends on brief that Herman and Annette are individually liable as transferees of the assets of Five Star Dresses, Inc., for income and excess profits taxes of that corporation for fiscal year 1946 to the extent of $40,850.67 and $21,297.24, respectively. In essence, it is respondent's position that said balances in the loan receivable accounts of the individual petitioners, as reflected on the books and records of Five Star Dresses, Inc., represent a series of gratuitous transfers in the form of forgiveness of indebtedness or constructive distributions beginning in fiscal year 1946 which ultimately rendered the corporate petitioner insolvent as of the close of fiscal year 1954, and that the individual petitioners are therefore liable as transferees for the deficiencies in income taxes of the corporation as determined herein. The individual petitioners *236 contest respondent's position on the ground, inter alia, that no tax was or is due from Five Star Dresses, Inc., and that, although admitting that they received money from the corporation (which they claim to have been loans) there can be no transferee liability where there is no tax due. Respondent's position is premised on the erroneous assumption that we would sustain his determination with respect to the disallowance of claimed cash disbursements ($103,404.84) and of travel and entertainment expenses ($6,100) of Five Star Dresses, Inc., for fiscal year 1946, which would, if sustained, result in a substantial deficiency in income and excess profits tax. In view, however, of the substantial adjustments we have made hereinabove with respect to the cash disbursements of Five Star Dresses, Inc., for the fiscal year 1946, together with the lesser adjustment for fiscal 1947, and accepting respondent's determination that the corporate petitioner is "entitled to a net operating loss deduction of $52,556.68 for the taxable year ended Septmeber 30, 1946, such deduction being based on the carry-back of net operating losses from the taxable years ended September 30, 1947, and September 30, 1948, in *237 the amounts of $50,941.79 (Schedule 7) and $1,614.89 (as shown on the return) respectively," it is clear that there was no deficiency with respect to the corporation for fiscal 1946. No deficiency is suggested for any other year. It is clear, therefore, that neither Herman nor Annette can be liable as transferee, since there is no existing corporate tax liability. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Herman Needelman, Transferee, Docket No. 54121; Annette Needelman, Transferee, Docket No. 54122; Herman Needelman, Docket No. 54123, Annette Needelman, Docket No. 54124.↩
2. For fiscal year 1947, Five Star Dresses, Inc., reported a net loss in the amount of $61,490.79 on its Federal income tax return. Respondent, in his statutory notice, reduced the amount of the loss by a total of $10,549.00, determining a corrected net operating loss of $50,941.79.↩
3. Although in paragraph 4 of the written stipulation of the parties herein, reference is made to Five Star Dress Company, the record shows that the proper name was Five Star Dresses.↩
4. Exhibit 2B of the Stipulation has two typographical errors. The gross profit and total income should each be $2,449.21 instead of $2,499.21, and the net loss should be $61,490.79 instead of $61,490.29.↩
1. The parties agree that the amount disallowed by the respondent is $103,354.84 as detailed above rather than the aggregate of $103,404.84 shown in the notice of deficiency without details. ↩
2. The figure of $20,317.50 was discovered to be $850 more than the amount of $19,467 used by respondent. The difference of $850 not previously disallowed is conceded by respondent. ↩
3. Of this item of $19,365.58, the amount of $2,962 represents disallowed "service charges" and the amount of $16,403.58 represents disallowed claimed cash purchases. ↩
4. The parties agree that the Wm. P. Fier account is properly $5,051 rather than $5,001. The difference of $50 not previously disallowed is conceded by respondent. ↩
5. Said amount was discovered to be $10 more than the figure used by respondent. This $10, not previously disallowed, is conceded by respondent. ↩
6. Said amount represents disallowed claim cash purchases. ↩
7. There is also shown on the books of petitioner additional service charges of $295, claimed to have been paid to Braunstein, which the examining revenue agent did not list as a disallowed cash purchase in the 30-day letter. The stated amount of $295 was not disallowed in the statutory notice of deficiency and is conceded by respondent. ↩
8. All of the items making up this total of $103,354.84, except as explained in notes 3 and 6, represent disallowed "service charges." ↩
9. The parties agree that the amount disallowed by the respondent is $7,799 as detailed above rather than the aggregate of $7,799 as shown in the statutory notice of deficiency without details. ↩
10. There are also shown on the books of petitioner additional service charges of $3,682, claimed to have been paid to Landmark, which the examining revenue agent did not list as disallowed cash purchases in the 30-day letter. The stated amount of $3,682 was not disallowed in the notice of deficiency, and is conceded by respondent.↩
5. The amount of $13,019.44, which we find as an ultimate fact, is an approximation, and is discussed in our Opinion, infra. Respondent raises no objection to the approximation itself, provided we find that substantially that amount was paid out as service charges on purchases for Herman's business, and is not deductible by Annette.↩
1. Before any adjustment by respondent.↩